**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YVES DHAENENS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>    v.<br><br>IMMUTEP LIMITED, MARC VOIGT, FRÉDÉRIC TRIEBEL and STEPHEN WINCKELS,<br><br>Defendants. | Case No. 1:26-03705<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Yves Dhaenens ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Immutep Limited ("Immutep" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Immutep's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Immutep American Depositary Receipts ("ADRs") between March 24, 2025 and March 12, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Immutep's TACTI-004 Phase III trial evaluating eftilagimod alfa (efti) in patients with advanced lung cancer. Defendants' statements included, among other things, Immutep's positive assertions of TACTI-004's future trial success based on continuing positive efficacy and safety readouts, particularly following positive top-line results from Immutep's prior TACTI-002 and INSIGHT-003 studies.

3.      Defendants provided these positive statements to investors while, at the same time, disseminating false and materially misleading statements and/or concealing material adverse facts concerning the efficacy and safety of its TACTI-004 Phase III clinical trial study. This caused Plaintiff and other shareholders to purchase Immutep's ADRs at artificially inflated prices.

4.      The truth began to emerge on March 13, 2026, when Immutep issued a press release announcing that the Independent Data Monitoring (IDMC) for the TACTI-004 Phase III study recommended that the trial be discontinued following a planned interim futility analysis. Further, based on its review of the available safety and efficacy data, the IDMC recommended that the trial be discontinued for futility.

5.      Investors and analysts reacted immediately to Immutep's revelation. The price of Immutep's ADRs declined dramatically. From a closing market price of $2.76 per share on March 12, 2026, Immutep's stock price fell to $0.48 per share on March 13, 2026, a decline of about 83%.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant Immutep's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Immutep ADRs at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Immutep is attached hereto.

12.     Immutep Limited is an international corporation with its principal executive offices located at Level 32, Australia Square, 264 George Street, Sydney 2000, New South Wales, Australia. During the Class Period, the Company's ADRs traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "IMMP."

13.    Defendant Marc Voigt ("Voigt") was, at all relevant times, the Executive Director and Chief Executive Officer of Immutep.

14.    Defendant Frédéric Triebel ("Triebel") was, at all relevant times, the Executive Director and Chief Scientific Officer of Immutep.

15.    Defendant Stephan Winckels ("Winckels") was, at all relevant times, the Chief Medical Officer of Immutep.

16.    Defendants Voigt, Triebel and Winckels are sometimes referred to herein as the "Individual Defendants." Immutep together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Immutep's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

4

18. Immutep is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Immutep under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20. Immutep is an Australian-based biotechnology company focused on developing Lymphocyte Activation Gene-3 (LAG-3) related immunotherapies for cancer and autoimmune diseases. The company's product pipeline includes TACTI-004, which is in phase III clinical trial for the treatment of first line non-small cell lung cancer (1L NSCLC).

### *The Defendants Materially Misled Investors Concerning the Viability of Immutep's TACTI-004 Phase III Clinical Trial*

### *March 24, 2025*

21. On March 24, 2025, Immutep issued a press release announcing that the first patient was safely dosed in its TACTI-004 Phase III trial. The pivotal TACTI-004 study will evaluate Immutep's eftilagimod alfa, a first-in-class MHC Class II agonist, in combination with MSD's (Merck & Co., Inc., Rahway, NJ, USA) anti-PD-1 therapy KEYTRUDA® (pembrolizumab) and chemotherapy as first line treatment for patients with advanced or metastatic non-small cell lung cancer.

22. As part of the press release, Defendant Voigt, stated, in relevant part:

Dosing the first patient in our pivotal Phase III trial ranks among the most significant milestones in the Company's history. We are excited about the potential of the TACTI-004 study to deliver a new standard-of-care therapy for patients with metastatic or advanced non-small cell lung cancer that includes efti in combination with KEYTRUDA. If successful, the study will result in a clinically meaningful

and statistically improved survival benefit and thus could potentially be practice changing.

23.     Further, Chief Scientific Officer Frédéric Triebel added, in pertinent part:

The ability of 30 mg efti in combination with KEYTRUDA to activate the immune system and fight non-small cell lung cancer regardless of PD-L1 expression has been demonstrated across multiple clinical trials. ***Importantly, this novel approach has an excellent safety profile while delivering strong efficacy that compares favourably to standard-of-care therapies, including high rates of durable responses and compelling progression-free survival and overall survival.***

(Emphasis added).

*April 29, 2025*

24.     On April 29, 2025, Immutep issued a press release providing a business update for the third quarter full year 2025. The press release reiterated that the first patient safely dosed in its TACTI-004 Phase III lung cancer trial, "marking a significant milestone." The press release stated in pertinent part:

The global Phase III trial with efti will randomize approximately 756 patients at more than 150 clinical sites and trial results will inform a potential marketing approval application in non-small cell lung cancer, one of the largest indications in oncology.

Immutep also presented the pivotal TACTI-004 Phase III trial as a Trial-in-Progress poster at the European Lung Cancer Congress (ELCC) 2025, in Paris, France, in late March. The poster included an overview and study design of the TACTI-004 Phase III trial. Informed by the Company's AIPAC-003 study, Immutep has determined to move forward with 30 mg efti dosing as the optimal biological dose. ***We have observed encouraging support from the investigators participating in the study in our meetings to date including those held at ELCC 2025 and after quarter end at the investigator meeting in Budapest, Hungary. Consistent feedback has been that the efficacy and safety data collected thus far from the TACTI-002 and INSIGHT-003 trials are impressive and address the unmet medical needs seen by many key opinion leaders.***

***Recruitment in TACTI-004 is underway at a growing number of activated clinical sites and countries with approvals from regulatory authorities expanded to now 19 countries including Australia, Austria, Belgium, Bulgaria, Canada, Germany, Greece, Hungary, India, Ireland, Italy, Latvia, Lithuania, Portugal, Spain, and the United Kingdom.***

6

(Emphasis added).

<em>July 30, 2025</em>

25.     On July 30, 2025, Immutep issued a press release providing a business update for the fourth quarter full year 2025. The press release touted that the Company's pivotal TACTI-004 Phase III trial was expanding through global enrollment and site activation. The press release stated in relevant part:

> Immutep's pivotal TACTI-004 Phase III trial is on track and continues to build momentum and is recruiting patients at a growing number of activated clinical sites and countries, with now 78 sites and 23 countries having received regulatory approval, following the successful dosing of the first patient at Calvary Mater Newcastle Hospital in Australia in March 2025.
>
> *     *     *
>
> ***The global Phase III trial with efti will randomize approximately 756 patients at more than 150 clinical sites and trial results will inform a potential marketing approval application in non-small cell lung cancer, one of the largest indications in oncology.***
>
> In late May, Immutep presented a Trial-in-Progress poster for TACTI-004 at the 2025 American Society for Clinical Oncology (ASCO) Annual Meeting in the United States. We have observed encouraging support from the investigators participating in the study in our meetings to date including those held at ASCO 2025, ELCC 2025, and an investigator meeting in Budapest, Hungary. Consistent feedback has been that the efficacy and the safety data collected thus far from the TACTI-002 and INSIGHT-003 trials are impressive and address the unmet medical needs seen by many key opinion leaders.

(Emphasis added).

<em>October 9, 2025</em>

26.     On October 9, 2025, Immutep issued a press release announcing that its TACTI-004 Phase III trial reached an important milestone after enrolling and randomizing over 170 patients, the amount necessary to conduct the futility analysis by an IDMC. Further, the number

7

of activated clinical trial sites continues to grow rapidly, with "over 100 active clinical sites across 25 countries globally." The press release stated in pertinent part:

> ***The TACTI-004 trial follows positive efficacy and safety results from two previous studies, TACTI-002 and INSIGHT-003, which tested efti with KEYTRUDA in 1L NSCLC.*** With in total over 165 patients enrolled, both trials demonstrate that efti enhances anti-PD-1 therapy regardless of PD-L1 expression levels. The novel combination of these two immunotherapies has led to high response rates and strong progression-free survival (PFS). Both trials show these responses and PFS translate into significantly improved overall survival, addressing a high unmet need for these patients.

(Emphasis added).

27.    As part of the press release, Defendant Voigt stated, in relevant part:

> ***We are very pleased with the pace of enrolment in our pivotal Phase III trial that we believe has the potential to change the treatment landscape in non-small cell lung cancer, one of the largest indications in oncology with over two million diagnoses annually worldwide. The trial remains on track for key milestones ahead including futility analysis in early 2026.***

(Emphasis added).

28.    Further, Chief Medical Officer Stephan Winckels added, in pertinent part:

> Our engagement with the principal investigators and physicians in the lung cancer community at medical conferences throughout the year, including WCLC 2025 last month, has consistently resulted in constructive feedback. ***Notably, their favourable assessments of the trial design and of efti as an innovative immunotherapy—capable of safely increasing response rates and improving efficacy in non-small cell lung cancer patients regardless of PD-L1 expression—*** provide a strong basis for ongoing positive enrolment trends.

(Emphasis added).

*October 29, 2025*

29.    On October 29, 2025, Immutep issued a press release providing a business update for the first quarter full year 2026. Most notably, the press release highlighted the progress of the TACTI-004 study and efti's positive development in the Company's oncology program, stating, in relevant part:

8

Immutep's pivotal TACTI-004 (KEYNOTE-F91) Phase III trial continues to build momentum and is recruiting patients at a growing number of activated clinical sites and countries. There are now over 100 clinical sites open for enrollment and 24 countries that have received regulatory approval.

The TACTI-004 trial evaluates eftilagimod alfa (efti), a first-in-class MHC Class II agonist, in combination with MSD's (Merck & Co., Inc., Rahway, NJ, USA) anti-PD-1 therapy KEYTRUDA® and chemotherapy as first line treatment for patients with advanced or metastatic non-small cell lung cancer (1L NSCLC). ***The global Phase III trial with efti will randomise approximately 756 patients at more than 150 clinical sites and trial results will inform a potential marketing approval application in non-small cell lung cancer, one of the largest indications in oncology.***

In July, Immutep announced that a Trials in Progress ePoster had been accepted at the European Society for Medical Oncology (ESMO) Congress 2025 which took place 17- 21 October in Berlin, Germany.

In September, Immutep presented a Trial in Progress poster presentation for TACTI-004 at the IASLC 2025 World Conference on Lung Cancer (WCLC), in Barcelona, Spain, where physician feedback continued to be encouraging. The Trial in Progress poster included an overview and study design of the trial.

***Subsequent to the end of the quarter, the Company announced in October that this global Phase III trial has enrolled and randomised over 170 patients, reaching an important milestone as this is above the amount needed to conduct the futility analysis, which remains on track for completion in the first quarter of CY2026.***

(Emphasis added).

<u>*December 16, 2025*</u>

30.     On December 16, 2025, Immutep issued a press release announcing "strong operational progress" in its TACTI-004 study with enrollment continuing at a "robust pace." Further, the press release provided an update on the Phase III trial, stating, in pertinent part:

- *The registrational TACTI-004 Phase III has enrolled 289 patients globally, over 38% of the trial's targeted enrolment*

- *Strong operational progress continues globally with over 120 activated clinical sites and 27 countries having received full regulatory approvals including the United States*

- *Futility analysis remains on track for the first quarter of CY2026 and completion of patient enrolment in the third quarter of CY2026*

\*     \*     \*

The registrational TACTI-004 trial has enrolled 289 patients (over 38% of the trial's targeted enrolment of 756 patients), and enrolment continues at a robust pace. ***Additionally, the number of activated clinical sites now exceeds 120 and 27 countries have received full regulatory approvals.***

***This includes the United States where the first of multiple clinical sites has received full regulatory clearance following the recent completion of the FDA's Project Optimus initiative and subsequent receipt of local and central Institutional Review Board (IRB) approvals.***

As announced on 9 October 2025, TACTI-004 had enrolled the necessary 170 patients to conduct the futility analysis that remains on track for the first quarter of CY2026. Furthermore, Immutep expects to complete patient enrolment in the third quarter of CY2026.

(Emphasis added).

31.     As part of the press release CEO Marc Voigt was optimistic about TACTI-004's trajectory, adding, in relevant part:

***We are very pleased with the strong operational progress of TACTI-004 globally and the robust pace of recruitment. Growing interest in this pivotal trial has been enhanced by the recent licensing deal for efti in emerging markets with Dr Reddy's. The Immutep team is excited about further delivering on key milestones ahead, including the futility analysis and completion of patient enrolment.***

(Emphasis added).

*January 29, 2026*

32.     On January 29, 2026, Immutep issued a press release providing a business update for the second quarter full year 2026. Further, the press release reiterated the "strong operational progress" in the TACTI-004 Phase III trial, stating, in relevant part:

In December, Immutep reported strong operational progress in the TACTI-004 (KEYNOTE-F91) Phase III trial evaluating efti in combination with MSD's (Merck & Co., Inc., Rahway, NJ, USA) anti-PD-1 therapy, KEYTRUDA® (pembrolizumab), and chemotherapy as first line therapy for

10

advanced/metastatic non-small cell lung cancer (1L NSCLC), one of the largest indications in oncology.

*The combination of efti with KEYTRUDA and chemotherapy has the potential to establish a new standard of care in 1L NSCLC by expanding the number of patients who respond to anti-PD-1 therapy, across all PD-L1 expression levels, along with enhancing clinical outcomes and extending patients' survival.*

As of mid-December, the registrational TACTI-004 trial had enrolled 289 patients (over 38% of the trial's targeted enrolment of 756 patients), and enrolment continues at a robust pace. Additionally, the number of activated clinical sites exceeded 120 and 27 countries had received full regulatory approvals.

*As announced in October 2025, TACTI-004 had enrolled the necessary number of patients to conduct the futility analysis that remains on track for the first quarter of CY2026. Immutep anticipates reaching 50% of the patient enrolment target for TACTI-004 soon.*

*    *    *

In October, Immutep announced that positive feedback had been received from the US Food and Drug Administration ("FDA") regarding the successful completion of Project Optimus requirements and agreement on 30 mg as the optimal biological dose for efti. *The agreement with the FDA on efti's optimal biological dosing carries strategic importance in the ongoing and future clinical development of efti, including the global TACTI-004 (KEYNOTE-F91) Phase III trial.*

(Emphasis added).

*February 6, 2026*

33.    On February 6, 2026, Immutep issued a press release announcing that the TACTI-004 trial "has enrolled 378 patients globally, 50% of the trial's targeted enrolment." Further, the press release noted the potential of efti establishing a new standard of care in 1L NSCLC, stating, in pertinent part:

The combination of efti with KEYTRUDA and chemotherapy has the potential to establish a new standard of care in 1L NSCLC, one of the largest and deadliest indications in oncology, by expanding the number of patients who respond to anti-PD-1 therapy, across all PD-L1 expression levels, along with enhancing clinical outcomes and extending patients' survival.

34.    As part of the press release, Defendant Voigt stated, in relevant part:

11

The excellent pace of enrolment globally in the TACTI-004 trial speaks to the promise of efti and the need for more efficacious therapies in the first line setting for patients with advanced/metastatic non-small cell lung cancer. ***Our team continues to work hard to bring this innovative cancer immunotherapy to market and looks forward to delivering on additional important upcoming milestones ahead, including the futility analysis in the first quarter and completing patient enrolment in the third quarter this year.***

(Emphasis added).

35.     The above statements in Paragraphs 21 to 34 were false and/or materially misleading as Defendants concealed and misrepresented the status and prospects of the TACTI-004 trial based on continuing positive efficacy and safety readouts of efti's performance in other trials, particularly following positive top-line results from Immutep's prior TACTI-002 and INSIGHT-003 studies. Further, Defendants announced in a Form-K filed with the SEC in January 30, 2026, that the trial was exhibiting "strong operational progress" and the planned interim futility analysis remained "on track for the first quarter of 2026." In truth, Immutep were aware of or were reckless, based on their access to internal clinical data, analyses, and reports concerning the TACTI-004 trial and its planned interim futility evaluation, that then-existing information materially increased the risk that the study would fail to meet its primary efficacy and/or safety endpoints.

### ***The Truth Emerges***

#### *March 13, 2026*

36.     On March 13, 2026, Defendants announced that the IDMC for the TACTI-004 Phase III study evaluating efti in patients in 1L NSCLC has recommended discontinuing the trial following a planned interim futility analysis. Further, "based on its review of the available safety and efficacy data, the IDMC recommended that the trial be discontinued for futility."

37.     Further, as part of the press release, Defendant Voigt stated, in pertinent part:

12

***We are very disappointed and surprised with the outcome of the futility analysis, in light of efti's performance in every other clinical trial.*** We would like to thank the patients, investigators, and clinical teams who contributed to this important study. We are currently conducting a comprehensive review of the available data to better understand the results and determine the appropriate next steps for the program.

(Emphasis added).

38.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements made during the above-referenced press releases. In those releases, Defendants continually highlighted that the TACTI-004 trial was exhibiting "strong operational progress" and the planned interim futility analysis remained "on track for the first quarter of 2026," while simultaneously minimizing the risk that the TACTI-004 trial would not meet its primary efficacy and/or safety endpoints.

39.     Investors and analysts reacted immediately to Immutep's revelation. The price of Immutep's ADRs declined dramatically. From a closing market price of $2.76 per share on March 12, 2026, Immutep's stock price fell to $0.48 per share on March 13, 2026, a decline of about 83%.

40.     A number of well-known analysts who had been following Immutep expressed surprise and disappointment at the Company's decision to discontinue its TACTI-004 Phase III trial. In particular, Jefferies downgraded to Hold, nothing "this is a very surprising outcome, given previous efficacy and safety readouts."

41.     Similarly, Baird Equity downgraded Immutep to Neutral on concerns of efti's future and decreased its target price to $1.00 from $7.00. Baird noted, in pertinent part:

It is unclear whether the decision was based on efficacy and/ or safety at this time. Immutep will now end enrollment and wind down the study. We are surprised by this result, based on the prior data for efti, but we do not see a clear path forward for efti…Admittedly, this news comes as a surprise to us, as prior efti/pembro/chemo data had shown numerically higher ORR, OS, and PFS vs. pembro + chemo alone regardless of PD(L)-1 expression levels, along with a positive safety profile.

13

42.     Additionally, Citizens downgraded Immutep to Market Perform expressing surprise by the outcome "given that very few studies fail at the futility analysis level. In our view, unless something happened with the conduct of the clinical trial, we believe the mechanism of action for efti will now be called into question."

43.     Furthermore, Maxim Group, also downgraded Immutep to Hold, and removed its prior 12-month target price of $12, stating, in relevant part:

> This is a disappointing result as TACTI-004 was the lead program for efti, and prior data suggested the combination should be effective in this setting. However, with the P3 stopped for futility, there is a significant lack of clarity on the path forward for Immutep, including its efti-based pipeline programs, in our view.
>
> *       *       *
>
> the P3 TACTI-004 study of efti in 1L NSCLC being halted for futility was disappointing, especially given the prior P2 data for the INSIGHT-003 trial in NSCLC which evaluated the same triple combo (efti + Keytruda + chemo). In our view, the P3 TACTI-004 study was the primary value driver, and while the company has other programs, including the P2/3 AIPAC-003 study in metastatic breast cancer and the P2b TACTI-003 study in 1L metastatic head & neck cancer, these are largely centered on efti, creating potential negative read-through across the pipeline and leaving limited visibility on next steps.

44.     The fact that these analysts, and others, discussed Immutep's shocking decision to discontinue its key TACTI-004 Phase III trial in NSCLC and the uncertainties of the Company's efti-based pipeline programs, suggests the public placed significant weight on Immutep's prior statements and efti trial data results. The frequent, in-depth discussion of TACTI-004 Phase III study progress and prior efti efficacy and safety results confirms that Defendants' statements during the Class Period were material.

### Additional Scienter Allegations

45.     During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements

14

disseminated on behalf of Immutep were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning interim efficacy data from the TACTI-004 clinical trial, including the likelihood that the study would not meet its primary endpoints. Despite such knowledge, Defendants repeatedly conveyed to investors that the TACTI-004 clinical trial was on track to produce positive results without the potential of weakening efficacy results.

46.     In fact, Defendants knew or deliberately disregarded the risks associated with efti and immunotherapy combinations that carry the potential risks of immune-related adverse events and/or unexpected side effects relating to the treatment of first line non-small cell lung cancers. In particular, Defendants repeatedly described TACTI-004 as exhibiting "strong operational progress" and touted the positive efficacy and safety readouts of efti's performance in other trials, particularly following positive top-line results from Immutep's TACTI-002 and INSIGHT-003 studies. while omitting the material safety concerns with the study.

### *Loss Causation and Economic Loss*

47.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Immutep's ADRs and operated as a fraud or deceit on Class Period purchasers of Immutep's ADRs by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Immutep's ADRs materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Immutep's ADRs during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

15

*Presumption of Reliance; Fraud-On-The-Market*

48.     At all relevant times, the market for Immutep's ADRs was an efficient market for the following reasons, among others:

(a)     Immutep's ADRs met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Immutep communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Immutep was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Immutep was reflected in and incorporated into the Company's ADR price during the Class Period.

49.     As a result of the foregoing, the market for Immutep's ADRs promptly digested current information regarding the Company from all publicly available sources and reflected such information in Immutep's ADR price. Under these circumstances, all purchasers of Immutep's ADRs during the Class Period suffered similar injury through their purchase of Immutep's ADRs at artificially inflated prices, and a presumption of reliance applies.

16

50.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with material information concerning the Company's ongoing clinical trials and viability of experimental treatments. These statements were not forward-looking and/or omitted material information about existing events and circumstances.

52.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

53.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Immutep who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made

17

by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Immutep's ADRs during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Immutep's ADRs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Immutep or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of June 30, 2025, there were 1.4 billion shares of the Company's ordinary shares outstanding. Upon information and belief, these shares are held by thousands, if

18

not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

56.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Immutep;

(c)    whether the Individual Defendants caused Immutep to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Immutep's ADRs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

60.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Immutep ADRs; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Immutep's ADRs

20

at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Immutep's ADRs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

64.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Immutep's internal affairs.

66.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Immutep's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Immutep's ADRs was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Immutep's ADRs at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

67.     During the Class Period, Immutep's ADRs was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Immutep's ADRs at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADRs, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Immutep's ADRs was substantially lower than the prices paid by Plaintiff and the other members

of the Class. The market price of Immutep's ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADRs during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Immutep's misstatements.

72.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Immutep which had become materially false or misleading.

73.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Immutep disseminated in the marketplace during the Class Period concerning

23

the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Immutep to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Immutep's ADRs.

74. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Immutep to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75. By reason of the above conduct, the Individual Defendants and/or Immutep are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: May 5, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ *Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff Yves Dhaenens*

25